IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

       v.                                              CR No. 16-01555 WJ

ISAAC JOSHUA SALAS,

       Defendant.

## ORDER OVERRULING DEFENDANT'S OBJECTIONS TO PRESENTENCE REPORT and COURT'S DETERMINATION OF DEFENDANT'S ADVISORY SENTENCING GUIDELINE RANGE

THIS MATTER comes before the Court following an evidentiary hearing on April 12, 2017 regarding Defendant's Objections to Presentence Report and Motion for Downward Variance, filed November 3, 2016 (**Doc. 35**).[1]  Having reviewed the pleadings, and heard the testimony and arguments of counsel, the Court **OVERRULES** Defendant's objections regarding the four-level enhancement under U.S.S.G. §2K2.1(b)(1)(B).

## BACKGROUND

On April 20, 2016, the defendant pled guilty to a one-count Information (Doc. 28).  Count 1 charged Possession of an Unregistered Firearm-Destructive Device, in violation of 26 U.S.C. §§ 5841, 5845(a)(8), 5861(d), and 5871.  Specifically, Defendant admitted to unlawfully possessing an unregistered firearm-destructive device (a "pipe bomb").

The background facts are set forth in the Defendant's brief (Doc. 35), but the Court presents a brief overview of the pertinent facts here.  The offense occurred on November 12, 2015, in Roswell, New Mexico, when Roswell Police arrived at a residence with a search

---

[1] At the hearing, the Court heard argument on Defendant's Objections to the Presentence Report but due to time constraints did not hear argument on the Motion for Downward Variance.  The Motion for Downward Variance will be taken up at a later time.

warrant attempting to locate Defendant's brother. Government witness New Mexico State Police Officer Gabriel Luna,[2] who is a certified bomb technician, testified that he was called to the Roswell residence because detectives believed they had located explosive devices. Specifically, during the course of the warrant execution, detectives searched Defendant's bedroom inside the Roswell residence and located several firearms, ammunition, magazines, pressure cookers, detonation cord, and numerous items that could be used to make explosive devices. Detectives also located chemicals, including ammonium nitrate, which can be used as an explosive device. Officer Luna located several books on how to make weapons, including a "Poor Man's James Bond" book which details how to construct improvised explosive devices and booby traps. Officer Luna testified that he eventually found items that he believed to be pipe bombs (Government Exhibits 1 and 2).[3]

Detectives also located four suspected firearm silencers (Government Exhibits 7, 8, and 30); however, one of the suspected silencers was immediately ruled out. The PSR identifies three suspected firearm silencers, but at the hearing counsel for the government explained that the government is including only two silencers for purposes of the four-level enhancement.[4] One of those silencers contains the words "Sounds of Nature,"[5] and one contains the words "Hfire" (items j and k listed in the PSR at ¶ 9). Neither device contains a serial number.

---

[2] Officer Luna is assigned to the New Mexico State Police Bomb Squad, Special Operations Division. He has been assigned to the Bomb Squad for six years, and has been a certified bomb technician for over four years.

[3] The parties do not dispute that Defendant possessed two pipe bombs at the time of the offense. Defendant's objections are focused on the two silencers and four explosive devices, or directional mines, that the government contends he possessed at the time of the offense to merit a four-level enhancement under U.S.S.G. §2K2.1(b)(1)(B).

[4] At the hearing, the government explained that the other suspected silencer that was ultimately ruled out was an oil filter that had been modified, but could also have been a solvent trap used for cleaning firearms. A firearms technology testing lab concluded the oil filter was not intended for use as a silencer because it did not have a hole drilled out of the end.

[5] The PSR states that the silencer contained the words "Sounds of Nature," but the Defendant's brief refers to this silencer as a "Sound of Silence" device and the parties referred to the device as "Sound of Silence" during the hearing. The Court accordingly uses the term "Sound of Silence" to refer to this particular silencer.

Detectives also located the following materials that were identified as a combination of parts to readily assemble four explosive mines (or "directional mines") and two explosive bombs (or "pipe bombs"):

- Galvanized steel pipe body with endcaps

- Three (3) wood blocks with steel pipe and large mouse trap as switch

- Live 12 gauge shotgun shell

- Detonation cord (Government Exhibit 34)

(Items w, x, y and z listed in the PSR at ¶ 9). At the hearing, the government's destructive device expert, ATF explosives enforcement officer Danny R. Waltenbaugh, testified in detail regarding the pipe bombs and directional mines. Officer Waltenbaugh specializes in destructive devices, bombs, explosives, and incendiary items. He primarily provides technical and expert support in determining what types of devices are destructive devices under the National Firearms Act. Officer Waltenbaugh explained that a destructive device is defined by the National Firearms Act as any explosive, incendiary or poison gas, bomb, rocket, grenade, missile, mine, or similar device. It also includes things that are a combination of parts that are components that make up what would be assembled into a destructive device. He stated that a pipe bomb is typically a pipe nipple that is sealed on both ends by an end cap, and then it has some form of explosive material or pyrotechnic composition inside of it and some method of initiating that powder inside.

Officer Waltenbaugh testified at length regarding the four directional mines detectives located in Defendant's bedroom. He elaborated that a directional mine is designed to explode when the victim trips it or steps on it. Specifically, rather than exploding in a general way, a

directional mine explodes and causes fragments and shrapnel and injurious type material to be projected in a specific direction.

Officer Waltenbaugh explained that Government Exhibits 1 and 2 are pipe bombs that were located in Defendant's bedroom, and these items meet the definition of a destructive device under 26 U.S.C. § 5845(f). Exhibit 1 consists of a pipe nipple with two end caps, and explosive materials were found in Defendant's bedroom. More specifically, one of the end caps was drilled with a hole so that a pyrotechnic fuse could be inserted, which was also found in Defendant's bedroom. The end cap could be unscrewed, the pipe filled with explosive powder, the fuse inserted, and these steps would make the item explosive. With regards to Government Exhibit 2, Officer Waltenbaugh elaborated that this item was likewise a combination of parts in order to readily assemble a pipe bomb. Exhibit 2 is similar to Exhibit 1 in that it consisted of a pipe nipple and one end cap had a hole drilled through it to enable a pyrotechnic fuse to be inserted. As with Exhibit 1, it would be filled with explosive powder and could explode with significant force.

Officer Waltenbaugh testified that Government Exhibits 3 through 6 are combination of parts in order to construct the four directional mines that detectives found in Defendant's bedroom. Each item consists of a block, a length of pipe, some type of a closure, (like a pipe nipple), and a large mouse trap with a spring assembly. In each one of these items, the closing component had a hole made in it of sufficient diameter to accept some type of item like a wire, nail, or firing pin. To operate each device, the pipe would be pounded in place so as not to move. A nail or other item would be placed, and a 12 gauge shotgun shell would fit inside the pipe. The nail would rest against the primer of the shotgun shell. When the wire is tripped, the shotgun shell would fire whatever was contained inside the shell through the tube, projecting it in

a specific direction. All four directional mines were of a similar construction, and all were painted camouflage.

One of the directional mines contained a spent 12 gauge shotgun cartridge inside of it, and gunpowder residue showed the device had been used. Officer Luna also explained earlier in the hearing that another of the directional mines contained a fully intact, live shotgun shell.

Officer Waltenbaugh concluded that none of the directional mines had any sporting or hunting purposes primarily because the devices were **not** designed to be held by hand. The four devices are specifically designed to attach to a trip wire in order for the device to be tripped, to explode, and to fire. ATF would classify the devices as explosive mines and destructive devices.

A number of other items were located in Defendant's bedroom that were not found to be destructive devices or explosive mines. For example, Government Exhibit 10 had many attributes of what could be an improvised bomb, but it had a light bulb attached to it and produced light. Officer Waltenbaugh explained that there was no way of differentiating that Exhibit 10 had been modified to be used as a weapon, or whether it was to be used as a light or something else for camping. With modifications, Exhibit 10 *could* have been made into an improvised explosive device, but compared to Exhibits 1 through 6, it would require significantly more modifications in order to explode and it had an objectively legitimate use because it illuminated and could simply be used as a light. Officer Waltenbaugh concluded that Exhibits 1 through 6, on the other hand, did not objectively have other legitimate uses besides as weapons.

## DISCUSSION

On August 2, 2016, the United States Probation Office disclosed Defendant's Presentence Report (PSR). Defendant's total offense level was calculated at 21, and his criminal

history points were calculated at two, resulting in a criminal history category of II. The resulting recommended sentence under the United States Sentencing Guidelines is 41 to 51 months.

The United States Probation office applied a four-level increase because it concluded that the offense involved 8 to 24 firearms. *See* PSR ¶ 18. Specifically, the PSR concluded that Defendant possessed three silencers and six destructive devices, pursuant to U.S.S.G. §2K2.1(b)(1)(B). Two more levels were added pursuant to §2K2.1(b)(3)(B) due to the type of destructive device Defendant admitted to possessing. *See* PSR ¶ 19.

Section 2K2.1(b)(1)(B) provides that a defendant receives a four-level increase if the defendant's offense involved 8 to 24 firearms. "Firearm" is defined by 18 U.S.C. § 921(a)(3) and includes "any firearm muffler or firearm silencer" and/or "any destructive device." 18 U.S.C. § 921(a)(3)(C)–(D).

"Silencer" is defined by 18 U.S.C. § 921(a)(24) and includes in its definition "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication."

"Destructive device" is defined pursuant to 26 U.S.C. § 5845(f) (emphasis added) as:

any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) **any combination of parts either designed or intended for use in converting any device into a destructive device** as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled.

Defendant objects to the four-level enhancement, contending that his possession of the silencers and the combination of parts to readily assemble four explosive mines was not unlawful, and that his offense level should not have been increased under § 2K2.1(b)(1)(B).

At the end of the hearing, counsel for the government clarified its position on the items that it claims to justify the four-level enhancement. The government explained that the four-level enhancement accounts for the two pipe bombs (Government Exhibits 1 and 2), four directional mines (Government Exhibits 3–6), and two silencers (Government Exhibits 7, 8, and 30), for a grand total of eight destructive devices. The government contends these eight items meet the requirements of § 2K2.1(b)(1)(B) to justify the four-level enhancement.

Defendant contends his offense level should be calculated at 15. Defendant does not take issue with the base offense level being 18 (PSR ¶ 17) because of the two pipe bombs, but he deducts three levels for acceptance of responsibility, bringing the total offense level to 15.

It is the government's burden to prove that an enhancement applies by a preponderance of the evidence. *U.S. v. Rodriguez-Felix*, 450 F.3d 1117, 1131 (10th Cir. 2006). The issue here is whether the government has established by a preponderance of the evidence that Defendant possessed two silencers and four directional mines at the time of the underlying offense, and that the offense involved at least one destructive device. Defendant contends there is insufficient evidence to support the four-level enhancement because the silencers were for mock guns ("airguns") and thus were not real, and the four directional mines were actually components to manufacture a trip line to protect his campsite. Defendant claims he did not intend to use any of the devices as firearm silencers or destructive devices. Defendant does not contest that the two pipe bombs constitute firearms for purposes of § 2K2.1(b)(1)(B).

## I.     **The Silencers**

Defendant argues the two silencers, the H-Fire and the Sound of Silence, were specifically made for airgun rifles and thus were not real silencers. He states these types of silencers can be purchased over the internet and are commercially marketed as faux silencers. The devices do not have serial numbers because they are not manufactured for firearms. Defendant further argues these mock silencers are manufactured without any capacity to muffle a firearm, evident by the fact that the Sound of Silence device reduced firearm noise by an average of 17.82 decibels and the Hfire device reduced such noise by an average of 14.55 decibels. Defendant claims "15 decibels is equivalent to a pin drop from a height of 1 centimeter heard at a distance of 1 meter and 30 decibels is equivalent to total quiet night time in the desert." Doc. 35, at 6–7. However, other than the arguments of Defendant's counsel, there is no testimony in the record regarding the specific nature of the decibel reduction of the two devices.

Further, Defendant contends the government cannot prove that Defendant knew the two devices had the capacity to silence, muffle, or diminish the sound of a firearm as opposed to an airgun or other mock firearm. Therefore, Defendant maintains the two devices are not silencers and do not constitute firearms under § 2K2.1(b)(1).

The government responds that although the two devices may be commercially marketed as airgun silencers, *any* reduction in decibels, no matter how slight, constitutes a silencer. The government points out that Defendant did not own any airguns, and the two devices clearly reduced the level of sound emitted from a firearm when tested and fired by a Bureau of Alcohol, Tobacco Firearms, and Explosives (ATF) agent.[6] At the hearing, the government's witness ATF Agent Dennis King testified that the Sound of Silence and Hfire were sent to a firearms

---

[6] Specifically, the ATF agent who tested the silencers shot a firearm five times without one of the suspected silencers attached. Then, the agent fired the weapon five times with each of the suspected silencers. A machine called a "nexus acoustic conditioner amplifier" was used to determine the average noise decibel reduction of the firearm shot with the suspected silencers attached.

technology lab to determine whether the devices were capable of being used as firearm silencers, and whether they had indeed been used as such. The lab concluded that the devices would reduce noise decibels when attached to a firearm. Specifically, Agent King explained the Hfire reduced sound by 17.82 decibels and the Sound of Silence reduced sound by 14.55 decibels. Agent King explained that residue of nitroglycerin was found within the Hfire. Nitroglycerin is a chemical compound found in smokeless powder that is used in ammunition. The nitroglycerin residue shows a round of ammunition had been fired through the Hfire and thus it had been used to silence a firearm. The Sound of Silence device did not contain nitroglycerin, though the lab still considered it to be a silencer because it had a baffling system and reduced the noise emitted from a firearm when tested.

As a result of the testimony and the evidence presented at the hearing, the Court finds and concludes that the United States has met its burden of establishing by a preponderance of the evidence that two items, the Sound of Silence and the Hfire, constitute silencers under 18 U.S.C. § 921(a)(24) and thus the two devices are "firearms" for purposes of the enhancement under § 2K2.1(b)(1). As Agent King testified, and Defendant conceded, the statute does not quantify a decibel reduction for a device to be considered a silencer.

The Court is not convinced by Defendant's contention that the devices are not silencers because they may have been manufactured for mock firearms or airguns. As Agent King testified, a device can be manufactured and marketed as a mock gun silencer, but if it nonetheless silences or muffles the sound report from a real firearm, the device constitutes a silencer under the § 921(a)(24). Indeed, although Defendant insists the two silencers were used merely for mock guns and cannot be considered firearms, Agent King testified a device manufactured to silence mock guns can nonetheless constitute a firearm silencer if it is placed on a real firearm.

This result is simply because the airgun silencer will reduce the noise emitted from the firearm, and in this case, both devices were tested with a real firearm, and both devices indeed reduced noise decibel emitted from the firearm.

Moreover, though Defendant emphasized his view that a sound decibel reduction of 14.55 decibels for the Sound of Silence and 17.82 decibels for the Hfire are slight reductions, Defendant agrees with the government that § 921(a)(24) does not quantify or otherwise measure a requisite sound reduction for a device to constitute a silencer. Instead, as Agent King explained, all the statute requires is *some* degree of sound reduction. Defendant concedes this point and acknowledges that the statute does not quantify how many decibels a silencer actually has to lower. And in this particular case, when the Hfire and Sound of Silence were tested by an ATF agent in a lab, both devices indeed muffled the sound emitted from a firearm. Furthermore, Agent King testified that no airguns or other mock firearms were located in Defendant's bedroom, and all the firearms seized by officers and in ATF custody were real firearms. Defense counsel also makes much of the fact that ATF did not "compare and contrast" the Hfire and Sounds of Silence devices with other known silencers in the testing lab, but there is simply no requirement that ATF do so. Again, all that is required under § 921(a)(24) is that the device muffle, silence, or diminish the sound of a firearm, and both silencers did so in this case.

Finally, the Court does not agree with Defendant that simply because neither device contained a serial number, neither device can be a true firearm silencer. Agent King testified that he had no knowledge regarding the existence of serial numbers and whether they show a manufacturer's intent that the device be used for a real firearm. However, Agent King explained that a homemade silencer would not contain a serial number, but could nonetheless amount to a silencer under the statute if it in fact muffled, silenced, or diminished the sound report from a

firearm. The Court also notes that defense counsel's insistence that neither device contained a serial number because they were intended only for use on mock guns is pure speculation. Other defense counsel's argument to this effect, there is no evidence in the record supporting that proposition.

## II.     The Explosive Mines

Next, Defendant argues the items that the PSR considered a combination of parts to readily assemble four explosive mines can serve a salutary purpose. Defendant claims he designed part of what is known as a "trip line" and that Campers use trip lines to protect their campsites from animals by setting up a perimeter line around their campsites. The directional mines would be placed around a campsite and connected together by wire. If the directional mines were placed facing into the ground, the shotgun shell is fired into the ground when the line is tripped. The loud explosion would notify the camper of the intruder, and would startle the person or animal that tripped the line. Defendant claims to be an avid outdoorsman, as shown by his collection of sleeping bags and other outdoor gear (Defendant's Exhibit GG), which he says indicates his intent to use the directional mines not as explosive devices but rather as a trip line.

Defendant also states that the reason a live shotgun shell was found inside one of the directional mines was because he was attempting to ensure he had the correct dimensions when constructing his trip line system. He could not afford to purchase blank shells so he used a live shotgun shell to test dimensions. The fact that the shotgun shell was stuck inside in the pipe shows that Defendant's dimensions were off when he tested the device. However, other than defense counsel's representations to this effect, there is no testimony or evidence in the record that supports the shotgun shell was being used for testing dimensions. Moreover, Officer Waltenbaugh clarified this point and explained that one of the mines had an unexpelled shotgun

cartridge inside of it, and another mine contained a spent shell casing, showing it had actually been fired at some time in the past.

Viewing the totality of the evidence presented by the parties, the Court concludes the United States has shown by a preponderance of the evidence that Defendant's intent in possessing the silencers and explosive mines was to use the items in an unlawful manner. Defendant possessed numerous books on how to construct weapons, explosive devices, and booby traps.[7]  He had chemicals commonly used in explosive devices, pyrotechnic fuse, firearms, and ammunition.  Notably absent from the items found in his bedroom were any books on camping, hunting, or constructing trip lines; rather, the books he possessed detailed how to construct booby traps and explosives.  Considering the totality of the circumstances, the Court is not convinced that Mr. Salas intended to use the directional mines to create a perimeter to guard a campsite.

On cross-examination of Officer Waltenbaugh, defense counsel pressed the point that the directional mines could have been used as a trip line to guard a campsite.  Defendant insists this is a legitimate sporting use of the devices.  The Court can conceive of no legitimate purpose to insert an explosive device into the ground so that a shotgun shell is fired into the ground if an animal or an individual triggers a trip wire, and the government has shown Defendant intended to use the devices unlawfully.  The Court's conclusion is due to the simple fact that even if Defendant were using the items in such a manner, Officer Waltenbaugh testified in great detail that the items would nonetheless be classified as destructive devices because of the substantial likelihood of a dangerous explosion *and* because the items would still constitute weapons due to

---

[7]  Specifically, detectives located the following books in Defendant's room: *Poor Man's James Bond Book*, *Anarchist Handbook*, *The Secrets of Methamphetamine Manufacture*, *Poor Man's Improvised Munitions Handbook*, *The Little Black Book of Violence*, *Build Your Own AR-15 Rifle*, *The Militia Battle Manual*, *Zombie Survival Guide*, and *Bazooka, How To Build Your Own*, as well as numerous manuals including *Build Your Own AR-15 Rifle* and complete construction plans for a submachine gun.

the intent to startle or scare the individual who would trip the line. The directional mines' characteristics nonetheless render them destructive devices because objectively, they are designed for use as a weapon. Officer Waltenbaugh explained that ATF broadly classifies what constitutes a weapon, and the definition includes items intended to startle or scare. So taking Defendant's claims into account (that the items were to build a trip line), even if the device fired into the ground and exploded, the potential for it to be launched out of the ground is highly likely due to the explosive force. The Court agrees with the government's point that although directional mines could theoretically be used for many purposes, those theories do not change the devices' objective characteristics as dangerous weapons.

Accordingly, the Court finds and concludes that the United States has met its burden to show by a preponderance of the evidence that Government Exhibits 3 through 6 were a combination of parts in order to construct four directional explosive mines.

Considering all of the evidence presented in this matter, the Court finds that the government has met its burden of proving that Defendant's offense involved at least eight firearms pursuant to § 2K2.1(b)(1)(B). The government has also met its burden in showing by a preponderance of the evidence that the offense involved a destructive device under § 2K2.1(b)(3)(B). Defendant's objections to the PSR are therefore **OVERRULED**.

### III. <u>Advisory Sentencing Guideline Range</u>

The Court having overruled Defendant's objections to the four-level enhancement under U.S.S.G. §2K2.1(b)(1)(B) and the two-level enhancement under § 2K2.1(b)(3)(B), the Court **FINDS** that Defendant's correctly calculated guideline sentence is Offense Level 21, Criminal History Category II, which results in an advisory sentencing guideline range of 41 to 51 months.

**SO ORDERED**

_____
UNITED STATES DISTRICT JUDGE